# No. 25-40402

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States of America, *Plaintiff - Appellee*

v.

Clarence Nero, *Defendant - Appellant*

## On Appeal from
United States District Court for the Eastern District of Texas,
Sherman Division, No. 4:22-CR-63-2, Hon. Amos L. Mazzant III, presiding.

## BRIEF OF APPELLANT CLARENCE NERO

Kristin R. Brown
17304 Preston Road, Suite 1250
Dallas, TX 75252
Texas SBN: 24081458
Email: kbrown@idefendDFW.com
Phone: 214-446-3909

## I.  CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Appellee:**
United States of America

**Counsel for Appellee:**
Marisa Miller
U.S. Attorney's Office, Plano TX
(Appeal)
Michael Anderson,
U.S. Attorney's Office, Plano TX
(Appeal and Trial)

Christopher Rapp
Ernest Gonzalez
U.S. Attorney's Office, Plano TX
(Trial)

**Appellant:**
Clarence Nero

**Counsel for Appellant:**
Kristin R. Brown, Dallas TX
(Appeal)

Eric Hanlin Hayes, Baton Rouge LA
F. Clinton Broden, Dallas TX
Michael A. Fiser, Baton Rouge LA
(Trial)

/s/Kristin R. Brown
Attorney of record for Clarence Nero

## II.  STATEMENT REGARDING ORAL ARGUMENT

Nero believes that oral argument is necessary to resolve the issues presented in this brief, especially regarding Issues Two and Three.  Issue Three is believed to be an issue of first impression for this Court.

## III.    TABLE OF CONTENTS

**Contents**                                                                                                    **Page(#)**

I.      CERTIFICATE OF INTERESTED PERSONS ................................................. ii

II.     STATEMENT REGARDING ORAL ARGUMENT ................................... iii

III.    TABLE OF CONTENTS ................................................................ 1

IV.     TABLE OF AUTHORITIES ......................................................... 1

V.      JURISDICTIONAL STATEMENT ..................................................... 3

VI.     STATEMENT OF THE ISSUES ...................................................... 4

VII.    STATEMENT OF THE CASE ........................................................ 5

   1.   Nero is named as a co-conspirator. ...................................... 5

   2.   A jury convicted Nero of all counts. .................................... 6

     a.   The Government filed to present any testimony regarding a drug conspiracy. ................................................................. 6

     b.   Through cross-examination of the government's witnesses, the defense established the full scope of the relationship between Nero and Brown................................................................. 12

     c.   The district court imposed a sentence of 264 months. .................. 14

VIII.   SUMMARY OF THE ARGUMENT ................................................. 16

IX.     ARGUMENT ................................................................ 17

   1.   The evidence is legally insufficient to support the jury's verdicts of guilt................................................................. 17

     a.   This Court's review should be de novo. ................................ 17

     b.   The Government failed to prove that Nero knowingly entered into an agreement. ................................................................. 19

     c.   The Government did not prove Nero intentionally or knowingly participated in a conspiracy.................................................. 22

     d.   The government failed to prove that Nero had knowledge of the amount of drugs found in the van. ...................................... 27

     e.   This Court should vacate Nero's convictions and issue Judgments of Acquittal................................................................. 28

2. The district court plainly erred by denying Nero's constitutional right to confront witnesses against him when it permitted the introduction of the statements of an unavailable co-defendant. ..................................... 28

   a. Review is for plain error............................................................... 28

   b. The trial court erred by admitting Brown's facially incriminating testimonial statements at their joint trial when Brown was not available for cross-examination. ................................................................. 29

   c. The error is clear and obvious. ..................................................... 32

   d. The error affected Nero's substantial rights............................... 35

   e. This Court should grant Nero a new trial on both counts of the Indictment because the district court's error seriously affected the fairness, integrity, and public reputation of the judicial proceedings. ... 36

3. Issue Three: Did the district court's improper exclusion of a potential juror over Nero's objection violate the Sixth Amendment's guarantee a fair trial by an impartial jury? ................................................................... 37

   a. This Court's review is for abuse of discretion. ............................ 37

   b. Juror 31 clearly stated he could be fair and would follow the law. 38

   c. Juror 31 was within the "strike zone." ........................................ 39

   d. Random selection of jurors is necessary to carry out the Sixth Amendment's guarantees. ............................................................ 40

   e. The error in this case appears to be one of first impression for this Court. ............................................................................................ 42

   f. The improper exclusion of a potential juror requires a new trial. ... 48

4. Did the district court plainly err by admitting expert testimony about fentanyl? ....................................................................................... 49

   a. The expert testified about the production, distribution, and potential wholesale value of the drugs. ...................................................... 49

   b. Because Nero's attorney did not object to the admission of the testimony, this Court reviews for plain error....................................... 50

   c. The error is plain............................................................................ 50

   d. The testimony affected Nero's substantial rights. ....................... 53

e. This Court should grant Nero a new trial on both counts of the Indictment because the district court's error in admitting Davis's testimony seriously affected the fairness, integrity, and public reputation of the judicial proceedings. .................................................................... 54

X. CONCLUSION ..................................................................... 55

XI. CERTIFICATE OF SERVICE ............................................. 57

XII. CERTIFICATE OF COMPLIANCE ....................................... 58

## IV.    TABLE OF AUTHORITIES

**Cases**

*Druton v. United States*, 391 U.S. 123 (1968) .............................................. 34

*Crawford v. Washington*, 541 U.S. 36 (2004) .............................................. 33

*Davis v. Georgia*, 429 U.S. 122 (1976) ...................................................... 50

*Davis v. Washington*, 547 U.S. 813 (2006) ................................................. 34

*Foy v. Donnelly*, 959 F.2d 1307 (5th Cir. 1992) ........................................... 35

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1946) ........... 50

*Peters v. Kiff*, 407 U.S. 493 (1972) ........................................................... 51

*Richardson v. Marsh*, 481 U.S.200 (1987) .................................................. 34

*Smith v. Phillips*, 455 U.S. 209 (1982) ...................................................... 47

*Swain v. Alabama*, 380 U.S. 202 (1965) .................................................... 48

*Theil v. Southern Pacific Co.*, 328 U.S. 217 (1946) ..................................... 47

*United States v. Dowen*, 818 F.3d 179 (5th Cir. 2016) ................................. 19

*United States v. Drooks*, 681 F.3d 678 (5th Cir. 2012) ................................. 21

*United States v. Drown*, 727 F.3d 329 (5th Cir. 2013) ............................... 18

*United States v. Davis*, 666 F.2d 195 (5th Cir. 1982) ................................... 22

*United States v. Dejean*, 988 F3d 813 (5th Cir. 2021) ............... 39, 45, 48, 49

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) ............................... 23

*United States v. Dominguez Denitez*, 542 U.S.74 (2004) .............................. 37

*United States v. Duckett*, 550 F.2d 1027 (5th Cir. 1977) ............................. 22

*United States v. Escalante-Reyes*, 689 F.3d 415 (5th Cir. 2012) ................... 30

*United States v. Espinoza-Seanez*, 862 F.2d 526 (5th Cir. 1988) ................. 35

*United States v. Fitzharris*, 633 F.2d 416 (5th Cir. 1980) ............................ 19

*United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995) .................................. 39

*United States v. Fuller*, 974 F.2d 1474 (5th Cir. 1992) ................................. 56

*United States v. Gonzalez*, 907 F.3d 869 (5th Cir. 2018) .............................. 28

*United States v. Hall*, 653 F.2d 1002 (5th Cir. 1991) ............................. 55, 56

*United States v. Harper*, 527 F.3d 396 (5th Cir. 2008) .................... 34, 36, 38

*United States v. Holmes*, 406 F.3d 337 (5th Cir. 2005) ........................... 37, 56

*United States v. Long*, 905 F.2d 1572 (D.C. Cir. 1990) ................................ 19

*United States v. Mares*, 402 F.3d 511 (5th Cir. 2005) ................................. 58

*United States v. Martinez–Salazar*, 528 U.S. 304 (2000) ................. 44, 48, 49

*United States v. Michelena-Orovio*, 719 F.2d 738 (5th Cir. 1983) ............... 23

*United States v. Miles*, 360 F.3d 472 (5th Cir. 2004) ................................. 19

*United States v. Nora*, 988 F.3d 823 (5th Cir. 2021) .................................. 20

*United States v. Page*, 161 F4th 876, 2025 U.S. App. LEXIS 32364 (5th Cir. 2025) ................................................................. 35

*United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996) ........................... 19

*United States v. Ramirez-Velasquez*, 322 F.3d 868 (5th Cir. 2003) .............. 53

*United States v. Restrepo*, 922 F.2d 173 (5th Cir. 1993) .............................. 35

*United States v. Ritz*, 548 F.2d 510 (5th Cir.1977) .................................... 22

*United States v. Salamone*, 800 F.2d 1216 (3rd Cir. 1986) ....... 46, 47, 48, 51

*United States v. Shah*, 95 F.4th 328 (5th Cir. 2024) .................................. 36

*United States v. Suarez*, 879 F.3d 626 (5th Cir. 2018) ............................... 23

*United States v. Thomas*, 690 F.3d 358 (5th Cir. 2012) ............................. 20

*United States v. Watkins*, 591 F.3d 780 (5th Cir. 2009) ............................. 20

*United States v. Xu*, 599 F.3d 452 (5th Cir. 2010) .................................... 18

*United States v. Zamora*, 661 F.3d 200 (5th Cir. 2011) ............................. 20

*Wainwright v. Witt*, 469 U.S. 412 (1985) ...................................... 39, 46, 48

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ............................................. 46

**Statutes**

18 U.S.C. §3231 ........................................................................................ 4

18 U.S.C. §3742 ........................................................................................ 4

21 U.S.C. §846 ..................................................................................... 6, 21

28 U.S.C. §1291 ........................................................................................ 4

28 USCS §1861 ................................................................................... 43, 44

**Other Authorities**

U.S. Dist. Ct. for the E.D. Tex., General Order 19-06 (2019) .................... 43

**Rules**

5th Cir Rule 28.2.1 .................................................................................. ii

Fed. R. Evid. 702 .................................................................................... 56

Fed. Rule Crim. Proc. 16 ......................................................................... 54

**Constitutional Provisions**

U.S. Const. amend. VI ............................................................................. 34

## V.    JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 18 U.S.C. §3231. The district court announced sentence and imposed its final judgment on June 24, 2025. ROA.191. Notice of appeal was timely filed on June 25, 2025. ROA.199. This Court has jurisdiction over this appeal under 28 U.S.C. §1291 and 18 U.S.C. §3742(a).

## VI. STATEMENT OF THE ISSUES

1. Was the evidence legally insufficient to support the jury's guilty verdict on the indicted offenses?

2. Did the district court plainly err by denying Nero's constitutional right to confront witnesses against him when it permitted the introduction of the statements of an unavailable co-defendant?

3. Did the district court's exclusion of a potential juror over Nero's objection violate the Sixth Amendment's guarantee a fair trial by an impartial jury?

4. Did the district court plainly err by admitting expert testimony about fentanyl?

## VII.   STATEMENT OF THE CASE

### 1. Nero is named as a co-conspirator.

Nero and his co-defendant, Quanita Sherries Brown, were charged in a second superseding indictment with two counts of Conspiracy to Possess with Intent to Distribute a Controlled Substance, *i.e.* heroin and fentanyl, in violation of 21 U.S.C. §846.[1]  ROA.15–16.  Collin Garrett was appointed to represent Nero, released on bond after a detention hearing in the Magistrate Court on May 17, 2023.  ROA.22, 27, 28.  Nero subsequently retained attorney Eric Hayes to represent him.  ROA.36.  F. Clinton Broden and Michael Fiser joined the defense team.  ROA.55, 76.

On June 12, 2024, a third-superseding indictment issued, changing only the dates the offenses were alleged to have been committed.  ROA.101-03.  Both parties filed pretrial motions.  The government filed a motion in limine requesting the pre-admission of statements Brown made during the traffic stop that led to her arrest and these charges against Brown and Nero.  ROA.82–93.  Trial counsel opposed the government's motion.  ROA.95–100.

---

[1] The original indictment and first superseding indictment charged only Nero's co-defendant, Brown.

5

## 2. A jury convicted Nero of all counts.

On June 24, 2024, Nero and his counsel appeared for trial. Nero's trial was joined with Brown's. *See e.g.* ROA.223. Nero persisted in his plea of not guilty (ROA.217), and a jury was seated.

### a. The Government filed to present any testimony regarding a drug conspiracy.

The government's first witness was Dustin Starks, a deputy with the Denton County Sheriff's Office. ROA.371. Starks indicated his job was to intercept smugglers. ROA.372. On Valentines Day 2022, Starks stopped Brown, who was driving a rented 2019 white Dodge van. ROA.374. Starks maintained that Brown had made an "unsafe lane change and [was] following too closely" the vehicle she came in behind. ROA.377. Starks told Brown he was only going to issue a warning for the alleged violations. ROA.379. Brown claimed that her boyfriend, Nero, had rented the car. EROA 376–77, 378. Brown also said Nero had the rental agreement for the van and she would have him email it to her. ROA.377. Brown made numerous statements which were contradicted by a license plate reader check that Starks had done prior to the stop which, in addition to "her body language" made Starks suspicious. ROA.381–85, 388. Bodycam footage of the entire stop and a transcript of the

6

audio portion of that footage was admitted without limitation against both Nero and Brown as Government's Exhibits ("GX") 1A and 1B. *See* ROA.908; (Media) GX 1A and 1B.

Starks testified that during the entirety of the traffic stop, some 40 minutes, Brown was on the phone with her boyfriend, who the screenname showed as CEO. ROA.476.

Starks continued investigating by asking Brown whether there were any narcotics in the van and if she would consent to a search of it, which she did. ROA.387. After Starks and his partner searched the car for some time without finding any contraband, they confronted Brown about the contradictions in her story and a screwdriver that they had found in a back-seat compartment of the van. ROA.92–93.

Interpreting Brown's reaction to the confrontation as revocation of consent to continue searching the van, Stark's partner deployed his K-9, who alerted at the right driver's side front wheel. ROA.394–95. Now armed with probable cause, Starks and other officers continued dismantling the interior of the van. ROA.395–96. When the officers discovered a rear speaker with screws missing, they removed the other screws, pulled out the panel and

7

speaker, and found three heat-sealed plastic bags containing a white powdery-brick. ROA.396.

Corey Halfmann was the government's second witness. ROA.490. Halfmann is a K-9 handler with the Denton County Sheriff's office. *Id.* Halfmann and his K-9 were paired with Starks on February 14, 2022 and participated in the stop. ROA.492. During the initial search of the rental van, Halfmann located a small screwdriver in a small compartment behind the center console. ROA.496. Eventually, Halfmann's K-9 was deployed and alerted on Brown's van. ROA.497. During the secondary search of the car, Halfmann noticed some screws missing from a back-side interior quarter panel along with some scratches on the plastic. ROA.503. Halfmann removed the panel and the speakers, uncovering the drugs. ROA.503–04.

The government's next witness was Robert Pircher, a computer forensics analyst with Homeland Security Investigations, who had conducted an extraction of the data from Brown's cell phone. ROA.514. Pircher testified that Brown had given them consent to search her phone and provided the passcode. ROA.515–16. The phone, extraction, and a .pdf file containing text messages between Brown and Nero as captured from Brown's phone

8

were admitted as Government Exhibits 9 (A) – (C). ROA.451, 518; GX 9(A)–
(C).

Aaron Rimbach, a detective with the Arizona Department of Public
Safety ("AZ-DPS"), was the government's fourth witness. ROA.523. Rimbach
testified about a traffic stop he conducted in September of 2019, when he was
working as a K-9 handler in the drug interdiction unit of AZ-DPS. ROA.524–
25. The driver of the car stopped had been seen leaving the residence of a
suspected drug house. ROA.524. During a search of the car, Rimbach found
nearly $150,000.00 in cash, broken down by denomination and wrapped.

Another AZ-DPS detective, Stephen Cronkite, was the government's
fifth witness. ROA.528. Acting on the currency Rimbach found in the traffic
stop, Cronkite applied for a warrant to search the residence of interest.
ROA.531. While waiting on the warrant, Cronkite observed Nero leaving the
residence and getting into a black truck, which he then drove away.
ROA.532. Before officers could stop the truck, a passenger jumped out and
ran off. ROA.532. A traffic stop was effectuated and the truck searched with
Nero's consent. ROA.534. No contraband was found, but it was noted that
the truck bed held a tire with the sidewall cut open. ROA.534. Three

similarly cut tires were found in the office of the target residence when the search warrant was executed later that day. ROA.535–36.

Next, the government called Gennesis Claro, a chemist with the Drug Enforcement Administration. ROA.544. Claro testified that she analyzed the substances found in Brown's rental van and found them to be fentanyl and heroin. ROA.550–51.

The seventh witness called by the government was Department of Homeland Security Special Agent Christopher Hunt. ROA.563. Hunt testified that he arranged for an extraction of the data on Brown's cell phone and then made a log of all oral and written communications found on the phone between Brown and Nero. ROA.569–78. Hunt reviewed the text messages between the two, many of which were then read to the jury and "deciphered" by Hunt during the government's direct examination. *Id*; EROA, 593– 646, 3217–3362. The entirety of the text messages was admitted against both Nero and Brown. ROA.1367–3362. Some of the messages include:

- (Brown to Nero): Images related to border check points including an article on the X-ray technology used at the checkpoint, with the text: "This was me today!! Second warning!!" ROA.600.
- (Nero to Brown): An article about a traffic stop leading to discovery of 40 pounds of narcotics. ROA.602–03.

10

- (Brown to Nero): "325 I own you because it was 850 owed. This shit is crazy. I'm really feeling like there was no separation…. Everything was one and I didn't pressure the company for the expenses. And I'm texting because I didn't call. Longest ten minutes ever. ROA.604.

- (Brown to Nero): "When you sit and think again about the money I cost you, please think about the risk I also accepted because of you. And I'm talking about where my suitcase with the big things is at. So don't ever think I did it again to hurt the company when I was an employee. I went far and beyond the call of duty. And that is priceless." ROA.608.

Hunt speculated that "the company" referred to the drug trafficking organization. ROA.604. Hunt also related a series of texts about a truck that Brown had in her possession being broken into and Nero telling her she should have left it at the airport. ROA.613. Hunt further relates texts between the two discussing rental cars and which types of vehicles "will not work." ROA.624–25.

Hunt also claimed that text messages indicate that Brown purchased a flight from Houston to Phoenix on February 12, 2022. ROA.640, The morning of February 13, 2022, Brown gets the green light from Nero to check in to her flight. ROA.641. Brown flies to Phoenix where she gets a ride to the convenience store located at an address sent to her by Nero, and then picks up the van that she then drives back through Texas and in which Brown is ultimately stopped. ROA.640–44.

11

Finally, the government called Jeff Davis, with the Denton County Sheriff's office, to give expert testimony on fentanyl, how it is produced, distributed, and consumed, calculations as to the number of pills that would likely have been produced from the seized fentanyl (nearly 1 million), as well as its wholesale value ($2 to $10 million dollars). EROA-771–78. These amounts did not include the fentanyl/heroin mixture. ROA.779.

### b. Through cross-examination of the government's witnesses, the defense established the full scope of the relationship between Nero and Brown.

The defense's case was presented through cross-examination of the government's witnesses. Starks insisted Brown's demeanor changed when she realized officers were going through her personal effects. ROA.466. Halfmann testified that the K9 hit on Brown's luggage. ROA.509. No drugs were found in Brown's personal effects. ROA.506, 509.

No one wore gloves until after the drugs were found ROA.507. No fingerprints or DNA evidence was taken from the scene or the drugs, despite the fact that such evidence could have showed who put the drugs in the van. ROA.512–13, 754–55. The only interaction law enforcement in Arizona had with Nero was five years earlier. ROA.542. Nero's sole contact with Arizona law enforcement was only because of his passenger. ROA.532. No drugs or

money was found on Nero during that stop. ROA.542. In fact, nothing from that sole interaction ever led to charges or complaints against Nero. ROA.543.

Cross examination of the forensic analyst showed that the entirety of the seizure was not tested, but instead random samples. ROA.559–60. Brown's attorney laid the foundation for the jury to understand the romantic relationship between Brown and Nero using the text messages admitted by the government. ROA.646–749. Nero's cross examination of Special Agent Hunt furthered the argument that Hunt's investigation and testimony was tainted by confirmation bias. (ROA.749–55).

At the end of the government's case, Nero moved for a judgment of acquittal arguing there was insufficient evidence to prove beyond a reasonable doubt that Nero was part of any alleged conspiracy on either count of the indictment. ROA.783. The district court promptly overruled Nero's motion. ROA.784.

In closing, the government argued "She was driving. He rented [the van]. They were in it together, part and parcel, every bit." ROA.795. Brown's trial counsel focused his argument on the romantic relationship between the

13

two. Nero argued that innocent behavior was framed as guilty behavior by the government because that's what fit the government's narrative. ROA.811–13. Nero went on to argue that the confirmation bias infected the case from the very beginning when Starks made his pretext stop. ROA.814–15, 836. Brown's closing argument echoed Nero's on the government's failure to fully investigate. ROA.821–23, 828–29, 835. Brown argued that, had they fully investigated, they would have seen that this was a romantic relationship, not a business one. ROA.821-33.

After deliberations, the jury returned guilty verdicts on both Counts One and Two. ROA.882-83.

### c. The district court imposed a sentence of 264 months.

The sentencing hearing was held on June 24, 2025. Nero objected to the leadership role adjustment. ROA.3390–93. The objection was overruled by the district court. ROA.895. Nero's offense level was calculated as a 36 including the leadership role enhancement of two points, and his criminal history category as III, which resulted in a guidelines range of 235 to 293 months on each Count. ROA.896.

Nero's trial counsel argued that any sentence within the guidelines range was almost certainly a life sentence, considering Nero's age and health, and asked the court to reconsider his objection or grant a variance that would allow him to return to life outside of prison at some point. ROA.897–98, 899. Counsel talked about Nero's family, his military and college experience, and the support he had from his family even still. ROA.897. The government asked that Nero be sentenced to the full 264 recommended in the PSR. ROA.900. The district court agreed and sentenced Nero to 264 months on each count of the Third Superseding Indictment, to run consecutively. ROA.902. A fine was waived, drug treatment recommended, the special assessment of $100.00 per case applied, and federal benefits were lost for five years. ROA.902. If Nero is released, he will be subject to five years of supervised release in each case, to run concurrently. ROA.902. The standard conditions of supervised release, adopted by the district court in it' General Order 17.3 were imposed, as well as the mandatory and special conditions and instructions included in the PSR, which was adopted by the district court. ROA.903. In pronouncing sentence, the district court denied Nero's request for a variance. ROA.903. The underlying indictments were dismissed. ROA.904. Notice of appeal was filed the following day. ROA.199.

15

## VIII.    SUMMARY OF THE ARGUMENT

Nero raises several grounds challenging his convictions and sentences. First, Nero asserts that the evidence was insufficient to support the guilty verdicts in this case. Because trial counsel argued this issue in a Rule 29 motion, this Court must review the issue de novo. Due to the limited evidence presented by this court, mainly text messages between Nero and his co-defendant Brown, Nero's departure from a house unconnected with him, but from which drugs were believed to have been trafficked, and the Valentine's Day traffic stop in which the vehicle which was rented by Nero but never shown to have been driven or otherwise touched by him, in which nearly four kilos of drugs were found secreted, the government failed to meet its burden to show beyond all reasonable doubt that Nero knowingly entered into an agreement with Brown, that Nero intentionally or knowingly participated in a conspiracy, or that Nero knew there were any drugs in the car—let alone nearly four kilos.

Second, the district court abused its discretion when it granted the government's request to strike juror number 31 for cause over Nero's objection. Juror 31 had been rehabilitated by the government and stated

16

clearly that despite his personal feelings, he could be fair and he would follow the law as given to him by the district court.

Third, the district court plainly erred by failing to sever the trials of the co-defendant's when the government planned to introduce Brown's statements on the roadside video at trial. Brown's statements facially implicated Nero and when she did not testify, Nero had no opportunity to confront her on those statements.

Fourth, the district court plainly erred in admitting the testimony of Jeff Davis. Evidence regarding the production, distribution, and value of the drugs was not relevant to the issue of guilt or innocence.

## IX. ARGUMENT

1. **The evidence is legally insufficient to support the jury's verdicts of guilt.**

   a. **This Court's review should be de novo.**

A general challenge to the sufficiency of the evidence preserves de novo review as to all potential sufficiency issues. *United States v. Drown*, 727 F.3d 329, 335 (5th Cir. 2013).

17

In Nero's oral motion for a judgment of acquittal, it was argued generally that "there is an insufficient amount of evidence to show that Mr. Nero was part of any alleged conspiracy that would be sufficient to sustain a verdict of guilty on either Count 1 or Count 2." ROA.783. The district court denied the motion. ROA.784. The defense rested without presenting evidence; thus, trial counsel was not required to reassert the motion at the end of the defense case. Nero's original motion preserves the issue for appeal, and this Court should review the matter de novo. *United States v. Xu*, 599 F.3d 452, 453 (5th Cir. 2010).

Even de novo review remains highly deferential to the jury's verdict, however and this Court will affirm unless when viewing the evidence and reasonable inferences in the light most favorable to the verdict, no rational juror "could have found the essential elements of the offense to be satisfied beyond a reasonable doubt." *United States v. Dowen*, 818 F.3d 179, 186 (5th Cir. 2016); *see also United States v. Miles*, 360 F.3d 472, 478 (5th Cir. 2004) (vacating a jury conviction when "a rational jury could not find" an essential element of the offense). But this Court does not "fulfill [its] duty through rote incantation of these principles followed by summary affirmance." *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990). Rather, this Court "must

18

ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law." *Id.* To that end, "a verdict may not rest on mere suspicion, speculation, or conjecture, or on an overly attenuated piling of inference on inference." *United States v. Pettigrew,* 77 F.3d 1500, 1521 (5th Cir. 1996). Although a jury may make factually based inferences, "a conviction cannot rest on an unwarranted inference, the determination of which is a matter of law." *United States v. Fitzharris,* 633 F.2d 416, 422 (5th Cir. 1980).

### b. The Government failed to prove that Nero knowingly entered into an agreement.

To establish a conspiracy under 21 U.S.C. §846, the government must prove: "1. an agreement existed between two or more persons to violated federal narcotics law;  2. the defendant knew of the existence of the agreement; and 3. the defendant voluntarily participated in the conspiracy. *United States v. Thomas,* 690 F.3d 358, 366 (5th Cir. 2012). "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." *United States v. Zamora,* 661 F.3d 200, 209 (5th Cir. 2011). "[K]nowledge of a conspiracy and voluntary participation may be inferred from a collection of circumstances." *Thomas,* 690 F.3d 358 (quoting *United States v. Watkins,* 591 F.3d 780, 788 (5th Cir.

19

2009)). In this case, Nero was charged by indictment with conspiracy to possess with intent to distribute heroin and fentanyl. The evidence was insufficient to support the conspiracy convictions because the government did not prove that Nero knowingly entered into an agreement.

The government's theory was: (1) drugs were hidden in a van that was rented by Nero, but driven by Brown; (2) Nero and Brown texted; and (3) because Nero rented the van that Brown drove and they had a relationship, they must be co-conspirators. But no testimony was elicited from a co-conspirator as to Nero's role, if he even had a role, or as to any agreement to participate in drug distribution. Remember, that at least two people must agree to possess with the intent to distribute these drugs. *See* 21 U.S.C. §846. Further, conspiracy has two intent elements. *United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021) (quoting *United States v. Drooks*, 681 F.3d 678, 699 (5th Cir. 2012)). The government must show "intent to further the unlawful purpose and the level of intent required to prove the underlying substantive offense." *Id.* Here, the government failed to produce any evidence that Nero and Brown had an agreement and that they intended to further the unlawful purpose of that agreement. *See id.* There was no testimony from any co-conspirator as to Nero's role in the organization. Instead, the government

20

speculated as to Nero's role based on his nickname in Brown's phone and their text messages. But, as shown on cross examination, many of the messages could be interpreted in multiple ways and many others showcased only the intimate relationship between Nero and Brown, not a criminal one.

The only evidence presented to show that Nero was intending to further an unlawful and conspiratorial purpose was that he rented the vehicle and directed Brown to the pickup spot. But that doesn't support the leap it takes to find he was responsible for putting it there. This is especially true considering it took law enforcement nearly an hour of searching to find the hidden narcotics and that was only because one officer noticed small marks in the plastic and two missing screws. *See* Govt. Ex. 1A. There is no telling who put those narcotics there, or when. If we knew the answers to those questions, then the agreement might be established, but it also might not. If Nero was part of a conspiracy to distribute drugs, then the government should have been able to answer critical questions such as: Where did the drugs come from, who is the supplier? Who was the "installer"? Who was the receiver? Additional questions come in regarding packaging: Where were the drugs packaged for distribution and by whom? There was no evidence of who facilitated the distribution or the sales; no evidence of infrastructure and

21

means to support distribution and sales; and no evidence that Nero facilitated the installation of drugs into that rental van. Close association with an alleged co-conspirator will not support the inference of a conspiracy. *United States v. Davis,* 666 F.2d 195, 201 (5th Cir. 1982). Just because Nero had an on-again/off-again romantic relationship with Brown and that—when they were on—he tried to finally assist her by paying her to set up his travel or even going to pick up a van in Arizona, does not prove knowing involvement in a conspiracy. *See United States v. Ritz,* 548 F.2d 510 (5th Cir.1977); *United States v. Duckett,* 550 F.2d 1027 (5th Cir. 1977). The government's entire case stems from Nero asking Brown to pick up the rental van and return it to New Orleans. The government's case lacked any evidence showing a knowing agreement to further a drug conspiracy. Because the government failed to show that Nero knowingly entered into an agreement to transport narcotics, the evidence is insufficient to support Nero's convictions and they should be overturned.

### c. The Government did not prove Nero intentionally or knowingly participated in a conspiracy.

In addition to proving that Nero knowingly entered into an agreement with Brown, the government was required to prove Nero intentionally or

22

knowingly participated in the agreement. *United States v. Suarez,* 879 F.3d 626, 631 (5th Cir. 2018). Possession of a large quantity of drugs, by itself, cannot serve as sufficient evidence to prove a conspiracy. *Compare United States v. Delgado,* 672 F.3d 320, 334 (5th Cir. 2012) (stating that although "possession of a large quantity of drugs"—in that case, 500 pounds—"is not, by itself sufficient to support a conspiracy conviction, it is evidence that can help justify the inference that more than one person must be involved in moving the large quantity toward its ultimate dispersal"), with *United States v. Michelena-Orovio,* 719 F.2d 738, 751–52 (5th Cir. 1983) (finding that a single act of importing twelve tons of marijuana, "more than mere mortals could personally consume in a lifetime," was enough to prove a conspiracy with intent to distribute).

The jury's view of the relationship between Nero and Brown is driven almost exclusively by the text messages they exchanged. The first text on Brown's prepaid phone—from October 13, 2019—shows she was nervous about a stop at a Customs and Border Patrol Checkpoint and an article about the government's 30-million-dollar X-ray technology employed at the border including handheld X-ray machines that could penetrate vehicles and identify hidden cavities. ROA.3217–18. Yet no drugs were found when the vehicle

23

was searched. It is certainly reasonable to believe that Nero's agreement with Brown was a lawful one: when he was unavailable, she would drive vehicles for him. The government put on no evidence that suggests Brown went to a specific location to deliver drugs on Nero's behalf, that she picked up money, or that she picked up drugs from an unknown co-conspirator and delivered them to Nero. Rather, the evidence shows a romantic relationship between the two—one in which Nero would have Brown do odd jobs for him and he would help her financially. Between Hunt's testimony and the text messages, the jury learned of the following texts from Brown to Nero in 2019:

- October 19, 2019: Brown texts Nero about border check points and sent an article on the X-ray technology being used at the checkpoints, with the text "This was me today!!" ROA.3217–18.
- November 22, 2019: "325 I owe you because it was 850 owed. This shit is crazy. I'm really feeling like there was no separation. Everything was one," and "I didn't pressure the company for the expenses. And I'm texting because I didn't call. Longest ten minutes ever." ROA.3239.
- November 23, 2019: "When you sit and think again about the money I cost you, please think about the risk I also accepted because of you. And I'm thinking about where my suitcase with the big things is at. So don't ever think I did it again to hurt the company when I was an employee, I went far and beyond the call of duty. And that is priceless. ROA.3246.
- December 8, 2019: "They rummaged into the glove box and armrest. Wasn't nothing stolen—nothing to take." ROA.3254

24

- December 9, 2019: "After you send the text on where the keys are located … I will be moving. I done stored shit and risked my f[*]ing freedom all for NOTHING!" ROA. 3263.

There is no discussion of drugs, in slang or otherwise, no extensive travel plans, no payments for her alleged participation in a "4 to 20 million dollar" drug conspiracy. The government used terms like "drug rip" to try to paint a run-of-the-mill burglary of a motor vehicle as a target entry for the sole purpose of finding drugs or money. ROA.612. But instead, the texts show that nothing at all was in the car and the context of the messages was regarding how to get the damage fixed under the insurance policy that Brown had been paying. ROA.612, 654–55, 3254–55, 3259, 3260, 3261. On cross-examination, SA Hunt reluctantly conceded this point. ROA.654–55.

Here too, the government failed to provide any nexus connecting Nero to the drugs found in the van Brown was driving. They simply showed an affair between Nero and Brown and the entanglements that generally accompany extramarital relationships.

Over and over again, the government's chief witness—SA Hunt—speculated as to the meaning of text messages between Brown and Nero highlighted in the "chosen" 146 (of approximately 1800) pages the

25

government showed the jury in its excerpt. (*Compare* Govt. Ex. 9D and 9E). Hunt repeatedly twisted context to suit the narrative of a drug conspiracy on direct examination, but then on cross examination would say "I could speculate" when asked if there could be an equal, but innocent, meaning. *See e.g.* ROA.658–59, 696, 703, 708–09, 712, 713, 714, 727, 735, 736 ("I'm just trying to put it in context as far as business"), 740.

The government continued to pick and choose texts that supported their case—like one from Brown to Nero on February 5, 2022, that asked: "So we on correct cause my bag is still packed from months ago" to which Nero did not respond. ROA.3320. About a week later, Brown asks Nero if she should check into her flight and they discuss her picking up a car. ROA.3348–56. Nero and Brown's agreement was not related to drugs, just to returning a vehicle to New Orleans that he didn't have time to drive back personally— just like the return in October of 2019.

Because the government had no direct evidence, they—through SA Hunt—relied on an "overly attenuated piling of inference on inference" in an attempt to link Nero to the drugs found in the van Brown was driving. The government repeatedly took messages out of context, isolating certain

26

phrases and making inferences, and then piled up those inferences to argue that Nero knew he was involved in a drug conspiracy. Because the government failed to meet its burden of proof, Nero's conviction should be overturned.

### d. The government failed to prove that Nero had knowledge of the amount of drugs found in the van.

There is no evidence to prove Nero even knew there were drugs hidden in the van, let alone the total weight of those drugs. Therefore, the government failed to prove that Nero specifically conspired to possess with the intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin and 400 grams or more of a mixture or substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §841(b)(1)(A). Drug quantity requiring a mandatory minimum sentence must be proven beyond all reasonable doubt. *United States v. Gonzalez,* 907 F.3d 869, 875 (5th Cir. 2018). A defendant's responsibility is limited to the amount with which he was directly involved or that was reasonably foreseeable to him. *United States v. Haines,* 803 F.3d 713, 740 (5th Cir. 2015).

27

Through lab reports and a toxicology expert, the government established that the van held nearly four kilos of fentanyl and heroin, but they failed to establish that Nero *knew* those drugs were in the van. There are no text messages, ledgers, or other evidence to show Nero knew drugs were hidden behind a panel in the van, let alone the weight of those drugs. As a result, the government failed to prove Nero's knowledge as to the quantity of drugs involved in the alleged conspiracy.

### e. This Court should vacate Nero's convictions and issue Judgments of Acquittal.

The government failed to prove the essential elements of the two offenses for which Nero was indicted. As a result, this Court should vacate the Judgments of conviction and issue Judgments of acquittal.

### 2. The district court plainly erred by denying Nero's constitutional right to confront witnesses against him when it permitted the introduction of the statements of an unavailable co-defendant.

### a. Review is for plain error

Trial counsel did not object to the admission of Brown's statements on the roadside video or to Deputy Starks recitation of those testimonial statements. (ROA.371–78; Govt. Ex. 1). Review of an unpreserved claim is for plain error. *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir.

2012). Plain error review consists of four prongs: (1) there must be an error; (2) the error must be clear or obvious, not simply subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which generally means it affected the outcome of the district court proceedings; and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings. *Id.*

### b. The trial court erred by admitting Brown's facially incriminating testimonial statements at their joint trial when Brown was not available for cross-examination.

The government's first witness was Dustin Starks, a deputy with the Denton County Sheriff's Office. ROA.371. Starks was running interdiction on February 14, 2022, when he observed the van that Brown was driving slow way down and cut in too closely between two vehicles when moving from the left lane to the right. the government introduced the video of the roadside traffic stop. ROA.373–74. Starks testified that he asked Brown for a copy of the rental agreement and that "she said she didn't have the rental agreement. She didn't rent it. Her boyfriend had rented it." ROA.376. Starks testified that Brown said her boyfriend was appellant, Clarence Nero. ROA.376–77. Starks went on: "there was no rental agreement [in the van]" and Brown "said that she had to reach out to him and that he would send it to her." ROA.377.

29

Starks testified that Brown was on the phone with Nero throughout the entire traffic stop. ERO.377-78, 417.

According to Starks, Brown said Nero had rented the van in New Orleans, then drove it to her house in Houston. ROA.378.

The roadside stop was recorded in its entirety on Starks's body-worn camera. ROA.414. A transcript of the video was created, and Starks attested to its accuracy. ROA.415. The video was admitted without objection as Government's Exhibit 1A ("GX1A") and the transcript was admitted, also without objection, as Government's Exhibit 1B ("GX1B"). ROA.415–416.

In the video, the jury heard Brown say the rental company "emailed the agreement to my boyfriend...he rented it. (GX1A, GX1B at page 5, lines 8, 10). Brown can be heard on the phone asking the other party "Can you send it to me?" *Id.* at page 5, line 12). Later, Starks again asks if she has the rental agreement with her. *Id.* at page 7, lines 15–17. Brown claimed she didn't know exactly when the van was rented, but it had been sometime the week before, and that Nero had drove it from New Orleans to Brown's house in Houston. *Id.* at page 9, lines 7–8, 15–21. Brown said her boyfriend's name is Clarence and that he had rented the van. *Id.* at page 10, lines 7-8. Brown

30

later clarified that Nero had rented the van on February 6 from New Orleans International Airport and drove it to Brown's house in Houston. *Id.* at page 20, lines 21–25; page 21, lines 1–2.

The traffic stop and search of the rental van was published to the jury. ROA.416. Play-by-play commentary was provided by Starks. ROA.416–18, 444–449.

The bodycam video shows Brown on the phone throughout the traffic stop. (GX1). The phone screen shows an active call with someone nicknamed "CEO." (GX1). Brown told Starks that she was on the phone with Nero at the time of the traffic stop. (GX1A, GX1B at page 24–25). Starks asks her to ask him who drove the van to Arizona on February 7th. *Id.* at lines 9–20. Brown said: "He just said, no one." *Id.* at line 20. When Starks questioned Brown about why there was a screwdriver in the back compartment of the console, Brown replied: "[Nero] said you are lucky that's all he[] found coming from New Orleans." *Id.* at page 27–28.

Nero and Brown were tried jointly. *See* ROA.156–73. At the time the confession was admitted, the jury was admonished not to use it in any way

against Nero. *See* ROA.156–73, 369–489, 851–870. Brown did not testify. ROA.792–793.

### c. The error is clear and obvious.

The Confrontation Clause provides the accused with the right "to be confronted with witnesses against him," U.S. CONST. amend. VI. This precludes the admission of out-of-court testimonial statements unless the declarant testifies at trial "and is subject to full and effective cross-examination." *Crawford v. Washington*, 541 U.S. 36, 59 (2004). This is true even when the declarant is a co-defendant. *Druton v. United States*, 391 U.S. 123, 126 (1968). "Where two defendants are tried jointly, the pretrial [testimonial statements] of one cannot be admitted against the other unless the confessing defendant takes the stand." *Richardson v. Marsh*, 481 U.S.200, 206 (1987). "[A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating [statement] of a non-testifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *United States v. Harper*, 527 F.3d 396, 402 (5th Cir. 2008). A facially incriminating statement is one that incriminates a defendant or "involve an inference that a jury could

make immediately without hearing other evidence and that a judge could easily predict before trial." *Id.* at 403.

Statements made in response to police questioning are "testimonial" when "the circumstances objectively indicate that there is no … ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington,* 547 U.S. 813, 822 (2006).

In *United States v. Restrepo,* this court held that *Druton* was not violated when a co-defendant's statements to a government agent, telling "him about trips to Miami to pick up expense monies for 'this operation,' which monies were to be used to rent a warehouse as a 'caleta,' or hiding place, and to hire someone to mind the Caleta" were admitted at trial. *United States v. Restrepo,* 922 F.2d 173, 185–86 (5th Cir. 1993). This Court explained: "Bruton is not violated unless Naranjo's statement directly alludes to Restrepo, which it clearly does not." *Id.* at 187; (citing *Foy v. Donnelly,* 959 F.2d 1307, 1312 (5th Cir. 1992); *United States v. Espinoza-Seanez,* 862 F.2d 526, 534 (5th Cir. 1988)). In *United States v. Page,* the appellant argued that admission of a co-defendant's plea of guilty violated his confrontation rights. *United States v.*

*Page*, 161 F4th 876, 2025 U.S. App. LEXIS 32364 (5th Cir. 2025). This Court found *Druton* was not violated by a guilty plea of a co-defendant because it did not name the appellant. *Id.* at *10–11.

In *Harper*, this Court reviewed statements of a co-defendant at a joint trial and found that the statements "such as the fact that Harper lived in the same house as Collins" and "Collins's admission that he sold crack cocaine in quantities known as 50's" did not facially incriminate Harper because they did not even refer to the existence of Harper or anyone else. *Harper*, 527 F.3d at 406. In *United States v. Shah*, the appellant's (all physicians) argued that the statement that money was to be paid to a company for doctor kickbacks facially implicated them. *United States v. Shah*, 95 F.4th 328, 371–72 (5th Cir. 2024). There, this Court found that "[a]lthough the proffer statement directly mentions 'doctors'… further evidence is required to link [the appellants]. *Id.* at 372. "[The] use of "doctors could have referred to any number of physicians. The fact that the three defendants were on trial and also doctors does not mean that the use of "doctors" facially implicated them … The jury had to decide which doctors were receiving kickbacks." *Id.*

Here, Brown's statements are testimonial because they were made in response to police questioning at a time when there was no ongoing emergency. Rather the primary purpose of Stark's questioning was investigation for potential future criminal prosecution. Stark repeatedly asked Brown who rented the vehicle. When Brown initially answered: "my boyfriend," Starks then asked for her boyfriend's name, at which time Nero was facially implicated. Nero was again facially implicated by Brown's testimonial statements that after renting the van in New Orleans, Nero drove it to Houston.

Had Nero's name been asked, there would be no facial implication. Rather, it would be akin to the situation in *Shah*, where more evidence was required to link the doctors. But here, Nero was named and he was named as the person who both rented and first drove the van. The same van in which his girlfriend Brown was later pulled over. The same van in which four kilos of drugs were hidden.

### d. The error affected Nero's substantial rights.

Error is prejudicial if there is a reasonable probability that result of the proceedings would likely have been different but for the error. *United States*

35

*v. Holmes,* 406 F.3d 337, 365 (5th Cir. 2005) (citing *United States v. Dominguez* , 542 U.S. 74, 81 (2004)).

Brown's statements were admitted to show that Nero—rented and drove the van at some earlier point, must have been part of a conspiracy with Brown to distribute it. As explained *supra,* in Issue One, the evidence against Nero was weak. There is a reasonable probability that but for the admission of these statements, Nero would not have been convicted.

**e. This Court should grant Nero a new trial on both counts of the Indictment because the district court's error seriously affected the fairness, integrity, and public reputation of the judicial proceedings.**

Nero was facially implicated by Brown's statements which were erroneously admitted at their joint trial. Because Brown did not testify, Nero did not have an opportunity for meaningful cross-examination. "[A] non-testifying witness's out-of-court statement, including a co-defendant's confession, that facially incriminates a defendant violates the defendant's Sixth Amendment right to confrontation...." *Harper,* 527 F.3d at 403. The violation of a defendant's constitutional right of cross-examination always affects the fairness, integrity, and public reputation of judicial proceedings.

This case is no different. This Court should vacate the Judgments of conviction and grant Nero a new trial.

### 3. Issue Three: Did the district court's improper exclusion of a potential juror over Nero's objection violate the Sixth Amendment's guarantee a fair trial by an impartial jury?

### a. This Court's review is for abuse of discretion.

A district court has broad discretion in assessing the impartiality of jurors during voir dire and the court's decision will only be overturned where there is a clear abuse of discretion. *United States v. Dejean,* 988 F3d 813, 816 (5th Cir. 2021). "A district court properly excuses a juror for cause when the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *United States v. Flores,* 63 F.3d 1342, 1354–55 (5th Cir. 1995) (citing *Wainwright v. Witt,* 469 U.S. 412, 424 (1985)). "Stated differently, the trial court has the discretion to excuse a juror when it is left with the definite impression that the prospective juror would be unable to faithfully and impartially apply the law." *Flores,* 63 F.3d at 1355 (citing *Witt,* 469 U.S. at 426). The appellate court gives "considerable deference to the [trial] court's decision to excuse on this basis because its decisions are based in large part on its face-to-face credibility assessment of the prospective jurors." *Flores,* 63 F.3d at 1355

37

(citing *Witt*, 469 U.S. at 426–29).  An Appellant is entitled to a new trial if he makes a showing of "manifest abuse." *Id.*

### b. Juror 31 clearly stated he could be fair and would follow the law.

During its portion of voir dire, the government asked the panel a general question about bias and prejudice:

> [I]s there anything that's going around in the news environment or in your just, you know, personal opinions of the world or anything like that that you would either hold something against us because of who we work for or give us some unfair benefit because of who we work for

ROA.255.  Juror 30 responded: "I'd probably give you unfair benefit because I think fentanyl is a scourge." *Id.*  The government reminded the jurors: "you take an oath to follow the law. Would you be able to still take your oath and follow the law as the Judge instructs you?" *Id.*  Juror 30 said they would. *Id.*  Next, Juror 14 said he would be biased in favor of the defense because of the United States government's position regarding Israel and Palestine. *Id.*  Juror 31 agreed with Juror 14 that they would be biased in favor of the defense, but Juror 31 did not explain why that was so.  ROA.256.  The government attempted to rehabilitate both jurors 14 and 31.  ROA.256–57.  Juror 14 was

38

not able to be rehabilitated, but Juror 31 stated that despite his reservations he would be able to follow the law. *Id.*

After voir dire, the government challenged Juror 31 on the basis of bias in favor of the defense. ROA.311. Defense Counsel objected on the basis that Juror 31 had been rehabilitated and stated he could follow the law. EROA 311–13. The district court acknowledged the government's rehabilitation of Juror 31: "I was surprised the Government *rehabilitated* someone who was a clear strike for cause…", but overruled Nero's objection and struck Juror 31 anyway:

> And, Mr. Rapp, I was a little surprised that you went -- asked those additional questions. But despite him saying he would follow the laws and follow the rules of the Court, I still think he established that he has a bias, so I'm going to strike 31 for cause.

ROA.311-13 (emphasis added).

### c. Juror 31 was within the "strike zone."

Panel members 2, 5, 6, 7, 11, 22, 24, 27, 28, 29, 33, 38 made it onto the Jury. ROA.113. Members 51, 52 were alternates. ROA.111, 113. The strike zone was through Number 47. ROA.111. Had the district court not improperly granted the government's request for a causal strike, the

39

government would have been required to exercise a peremptory strike on Juror 31.

### d. Random selection of jurors is necessary to carry out the Sixth Amendment's guarantees.

Federal law grants all litigants in federal court who are entitled to trial by jury "the right to grand and petit juries selected *at random* from a fair cross section of the community in the district or division wherein the court convenes." 28 USCS §1861.

Section 1861 requires each division of the federal courts to have a written "Plan for the Random Selection of Jurors" ("Plan") USCS §1861, *et seq.* The Plan in place for the Eastern District of Texas at the time of the jury trial in this case was adopted by General Order 19-06. U.S. Dist. Ct. for the E.D. Tex., General Order 19-06 (2019) (approved by this Court May 14, 2019), *available at* https://txed.uscourts.gov/?q=documents/plan-random-selection-jurors.[2] The Eastern District of Texas utilizes a "fully automated, electronic data processing system" to facilitate the Plan. *Id.* at 4. Names of

---

[2] Federal appellate courts may take judicial notice of adjudicative facts at any stage of proceedings, including on appeal. Fed. Rule Evid. 201(f), Such notice covers facts not subject to reasonable dispute, either generally known or accurately determined from reliable sources. Meeting these requirements, Appellant asks this Court take judicial notice of General Order 19.06.

prospective jurors are sourced from voter registration and "licensed drivers" lists. *Id.* These names make up the "Master Source List" in each division from which "the names of all grand and petit jurors … shall be selected at random…." *Id.* at 4. A "Master Jury Wheel" of at least 1000 persons is then created by electronic random selection at the direction of the Clerk of each division or other person authorized by the court. General Order 19–06 at 4–5. Additional selections are added as needed to ensure a sufficient number of names remains in the wheel. *Id.* at 5. Each master wheel is emptied and refilled every two years, following federal general elections. *Id.* The list is then qualified before names are drawn and summonses issued. *Id.* at 6–9, 10–11. The names are drawn at random, and each name is "counted in sequence, starting with number one, until the number of names required to fill the panel [is] drawn." *Id.* at 11.

The petit jury properly includes all persons randomly summoned who were not disqualified, exempt, excused, or properly excluded by the court, in the order they were selected. *Id.* at 6–10; *see also* 28 USCS §1861, *et seq.* When a district court improperly dismisses a rehabilitated juror, it disrupts the random selection process and violates the defendant's constitutional rights regarding jury formation.

41

### e. The error in this case appears to be one of first impression for this Court.

Appellant finds no cases from this Court that are directly on point to this issue, but two which are instructive. In the first of these cases, a federal district court denied the defendant's causal strike on a biased juror. *United States v. Martinez–Salazar*, 528 U.S. 304, 308–09 (2000). Rather than permitting the biased juror to sit on the jury, the defendant exercised a peremptory strike on him. *Id.* at 309. Martinez–Salazar did not request an additional strike under Fed. Rule Crim. Proc. 24(b. *Id.* On appeal, Martinez–Salazar complained that the trial court's error violated his right to due process by requiring he utilize a peremptory strike curatively. *Id.* at 309–10. The Government did not contest that the juror was biased but rather argued there was no harm. *See Martinez–Salazar*, 528 U.S. at 309.

The appellate court found a violation of due process, but the Supreme Court reversed, holding that Martinez-Salazar was not denied anything he was entitled to under the law because the law provided for a total of 11 peremptory strikes (including for alternates) and that is what Martinez–Salazar received. *Id.* at 315.

In the second case, the state district court denied the defendant's request to strike, arguing that the juror had stated she couldn't be fair. *Dejean*, 988 F.3d 813, 815.  The state district court denied the strike explaining "[t]hat wasn't the context of her testimony.  She said …, not…." *Id.* Dejean did not use a peremptory strike on the juror, exhausted all allotted strikes on other potential jurors, and did not request an additional strike for that juror. *Id.* The complained-of juror ended up on the jury panel. *Id.*

After Dejean was convicted, a motion for new trial was filed alleging his right to an impartial jury had been violated. *Id.* The state court denied the motion, disagreeing that the juror had exhibited bias in jury selection: "While defense counsel ultimately was able to extract a concession from [the juror] that she shouldn't sit on the case, it was the court's impression that [the juror's] ultimate acquiescence was made in response to leading questions and out of a desire to simply end the questioning." *Id.* at 815.

On appeal, Dejean argued the state court violated his Sixth Amendment right to an impartial jury. *Dejean*, 988 F.3d at 816.  Based largely on the explanation given by the state court in denying the motion for new trial, this Court found no constitutional violation.

The most instructive case found on this issue is from the Third Circuit, where panel members who were members of the National Rifle Association were excused for cause, despite not having stated they could not follow the law or rules of the court. *United States v. Salamone*, 800 F.2d 1216, 1220–22 (3rd Cir. 1986).

On appeal, Salamone analogized the exclusion of NRA members from his petit jury to the United States Supreme Court's opinion on juror disqualification, *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and contended that a jury swept clean of those who opposed gun control legislation, but were not asked whether they could follow the law and rules of the court, could not withstand the *Witherspoon* test. *Id.* at 1218. Under *Witherspoon*, a potential juror could be properly excluded if he made it "unmistakably clear" that he could not set aside his personal views and follow the law. *Witherspoon*, 391 U.S. at 522, n.21. This standard was later redefined by *Wainwright v. Witt*, 469 U.S. 412 (1985).

The Third Circuit noted that Salamone's challenge to the district court's voir dire did not allege a failure to uncover actual bias, resulting in the seating of partial jurors. *Salamone*, 800 F.2d at 1224. "Rather, Salamone's objection

44

[was] to the *presumed* bias of potential jurors which occasioned the arbitrary exclusion of an entire class of otherwise qualified jurors from his panel." *Id.* (emphasis in original).

The government argued that based on a theory of "implied bias," no abuse occurred in the exclusion of jurors whose views *might* affect their ability to serve impartially. *Id.* at 1225 (citing *v. Phillips*, 455 U.S. 209 (1982) (declining the idea of implied bias except in potentially very narrow circumstances)). The Third Circuit found the government's position "untenable and potentially dangerous." *Salamone*, 800 F.2d at 1225.

> To allow trial judges and prosecutors to determine juror eligibility based on their perceptions of the external associations of a juror threatens the heretofore guarded right for an accused to a fair trial by an impartial jury as well as the integrity of the judicial process as a whole.

*Id.* at 1226. "Moreover, the government's position misconceives the grounds for juror disqualification. 'Jury competence is an individual rather than a group or class matter.'" *Id.* (quoting *Theil v. Southern Pacific Co.*, 328 U.S. 217, 220 (1946)). Challenges for cause permit exclusion of jurors "on narrowly specified, provable, and legally cognizable bases of partiality. *Salamone*, 800 F.2d at 1226 (quoting *Swain v. Alabama*, 380 U.S. 202, 220

45

(1965). The central inquiry is whether the potential juror views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *Id.* at 1226 (*quoting Witt,* 469 U.S. at 433).

The Third Circuit found that no such impairment had been revealed and exclusion of the jurors was an abuse of discretion and "not in accord with the essential demands of fairness to which appellant was entitled." *Salamone,* 800 F.2d at 1226–27. The court further found that "manifest abuse" was evidence and Salamone was entitled to a new trial: "we find the inadequate voir dire by the trial court set into motion a series of events, all of which had an incalculable, prejudicial effect on appellant's right to a fair trial by an impartial jury." *Id.* at 1227–28.

Here, Juror 31 was excluded from participating in the trial as a juror despite the fact that he stated he could follow the law and rules of the court.

Both *Martinez–Salazar* and *Dejean* involved defense motions to strike a potential juror for cause, which was denied by the trial court. In *Martinez-Salazar,* the Supreme Court found the district court's error was cured through

the exercise of a peremptory strike. In *Dejean*, this Court found there was no error, thus there was nothing to cure.

Unlike in *Martinez–Salazar*, the district court's error could not be cured by a peremptory strike by Nero—Juror 31 had already been excused. And, unlike in *Dejean*, here the district court gave no explanation as to how—when it agreed that the government had rehabilitated Juror 31—there was anything that could still support the government's later challenge for cause.

Unlike Martinez-Salazar and Dejean, but like Salamone, Nero does not object to the inclusion of biased jurors on his jury but to the exclusion of otherwise qualified jurors from his jury. Implied bias—even under the narrow circumstances discussed in *Phillips*—has no role in this case. *See Philips*, 455 U.S. 221–24 (O'Connor, J., concurring).

Jury competence is an individual standard. Upon the government's successful, though errant, rehabilitation, Juror 31 met that standard. The trial court abused its discretion in granting the government's later challenge for cause.

### f. The improper exclusion of a potential juror requires a new trial.

As Justice Rehnquist noted in *McDonough Power Equip., Inc. v. Greenwood*: "Demonstrated bias in the responses to questions on voir dire may result in a juror being excused for case; hints of bias not sufficient to warrant challenges for case may assist parties in exercising their peremptory challenges." 464 U.S. 548, 554 (1946). The government's motion to strike Juror 31 for cause should have been denied and any hint of bias the government believed existed should have guided its exercise of peremptory strikes.

Unless a venireman is 'irrevocably committed' against following the law "regardless of the facts and circumstances that might emerge in the course of the proceedings, he cannot be excluded. If a venireman is improperly excluded, even though not so committed, any subsequently imposed [verdict] cannot stand." *Davis v. Georgia*, 429 U.S. 122, 123 (1976) (internal citations omitted).

Nero is entitled to a new trial in this case because "there is no way to determine what jury would have been selected under a constitutionally valid system, or how that jury would have decided the case." *Peters v. Kiff*, 407

48

U.S. 493, 504 (1972). The "essential demands of fairness dictate that the errors of the prosecutor and trial judge not be visited upon [the] appellant." *Salamone*, 800 F.2d at 1227. The district court's erroneous granting of the causal strike on Juror 31 "set into motion a series of events, all of which had an incalculable, prejudicial effect on appellant's right to a fair trial by an impartial jury."

As a result, this Court should vacate the Judgments of conviction and order a new trial on both counts.

## 4. Did the district court plainly err by admitting expert testimony about fentanyl?

### a. The expert testified about the production, distribution, and potential wholesale value of the drugs.

As its last witness, the government called Jeff Davis, a commander in the Special Operations Division of the Denton County Sheriff's Office. ROA.771. Davis testified as an expert about fentanyl generally and how it is typically consumed. Davis explained that fentanyl is converted into pill form by a pill press that can be purchased online dyes, stamps, and filler material for the pills. ROA.773, 775. Although he had no participation in the case's investigation, Davis was asked to look at a photograph of the drugs found in the van and estimate how many pills could be made from the fentanyl.

49

ROA.776. Using data from the average pill recovered through the DEA, Davis estimated total production at nearly one million pills. ROA.777. Davis estimated the bulk wholesale value at between two and ten million dollars. ROA.778–79. On cross-examination, Davis admitted he did not know if the case involved any of the typical tools of fentanyl production that he discussed or not. ROA.780.

### b. Because Nero's attorney did not object to the admission of the testimony, this Court reviews for plain error.

Because Nero's attorney did not object to the admissibility of the expert witness, this Court's review is for plain error. *United States v. Ramirez-Velasquez*, 322 F.3d 868, 878–79 (5th Cir. 2003). The plain error standard is explained, *supra*, in Issue Two.

### c. The error is plain.

First and foremost, the government is required to disclose the expert testimony that it plans to elicit at trial. To comply with Rule 16, the government must provide a written statement containing: (1) "a complete statement of all opinions that the government will elicit from the witness;" (2) "the bases or reasons" for those opinions; (3) the witness's qualifications; and (4) a list of all cases in which the witness testified as an expert in the

preceding four years. Fed. Rule Crim. Proc. 16(a)(1)(G)(iii). The advisory committee note to the 2022 amendment to the Rule explains that it is "intended to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony if needed." Id. at committee's note to 2022 amendment. The Note goes on to explain that "the amendment requires a complete statement of all opinions that the expert will provide but does not require a verbatim recitation of the testimony the expert will give at trial. Id.

Disclosure must be given according to the deadline imposed by the court through an order or local rule, but "must be sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence." Id. at (a)(1)(G)(ii). The scheduling order in this case required notice of experts within five days of arraignment or receipt of the order, whichever was first. ROA.41. The order did not require the defense request disclosure. Id. Arraignment occurred on the same date that order was transmitted through the ECF system, May 26, 2023. See ROA.41, 207. The government did not give notice of any experts until more than a year later, just seven days prior to trial, and amended the motion three days prior to trial to include notice of Davis. ROA.133, 140. Further, the notice failed to

51

include studies that Davis relied upon in reaching his opinion, Davis's prior experience, his prior testimony, and failed to state how Davis had knowledge of the packaging and storing of heroin and fentanyl for transport, the methodology for pill making using heroin and fentanyl, or the wholesale value of drugs. Therefore, the notice fails to connect Davis's testimony about fentanyl generally to the facts of this case. *See United States v. Hall,* 653 F.2d 1002, 1005–06 (5th Cir. 1991) (finding that a DEA agent's expert testimony on purely DEA investigative procedures in general and in hypothetical terms was irrelevant because he discussed no facts bearing on the prosecution of the case). To comply with Rule 16, the government was required to explain how Davis's opinions relate to the facts of *this case,* and are not just about fentanyl and heroin generally.

Second, Davis's testimony was irrelevant to the issue of guilt/innocence and was prejudicial to Nero. A qualified expert witness may offer opinion testimony *if* "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Davis's testimony did neither of those. Rather, Davis served to testify about the how easy it is to make fentanyl pills and how much money can be made from them. But, the drugs in this case were not pills and what might have happened to

52

them later was not relevant to the issues the jury had to determine, which was: whether the alleged drugs were in fact drugs; whether there was a conspiracy to possess the drugs with the intent to distribute them; whether Nero was part of the conspiracy, and—if so—what amount of drugs Nero could be held accountable for. (*See* ROA.156–173). Based on the evidence in the case and what the jury had to determine, Davis's testimony regarding production, distribution, and wholesale value was wholly irrelevant. *Compare United States v. Fuller,* 974 F.2d 1474, 1482–83 (5th Cir. 1992) (permitting testimony about facts directly related to the investigation and ultimate arrest) with *Hall,* 653 F.2d at 1005–06. Like the expert in *Hall,* Davis's "testified to no facts bearing on any manner on the prosecution of [Nero] or on the investigation leading to that prosecution." *See Hall,* at 1006. "His testimony had no tendency whatsoever to make the existence of any fact of consequence to the government's case in chief either more or less probable than it would have been without his testimony." *Id.* As a result, the admission of Davis's testimony was plain error.

### d. The testimony affected Nero's substantial rights.

The error in admitting Davis's testimony was plain and affected Nero's substantial rights. Error is prejudicial if there is a reasonable probability that

53

result of the proceedings would likely have been different but for the error. *Holmes*, 406 F.3d at 365 (citing *Dominguez Denitez*, 542 U.S. at 81).

Davis's testimony was a scare tactic played on the jury, used to show that with so much money to be made, Nero—whose name is on the rental of the van—must be part of a conspiracy with Brown to distribute it. But instead of focusing on the issues of this case, Davis's testimony involved wholly irrelevant topics such as pill presses, dye, stamps, filler material, distributing networks for international drug trafficking organizations, and how much money these organizations can make by selling already-produced *pills* to drug dealers to resell. But none of these topics played any role in determining Nero's guilt for the charged offenses. There was zero evidence that Nero produced pills or made money distributing fentanyl pills. Considering Davis's testimony, the jury could reasonably conclude someone involved with fentanyl should be convicted.

**e. This Court should grant Nero a new trial on both counts of the Indictment because the district court's error in admitting Davis's testimony seriously affected the fairness, integrity, and public reputation of the judicial proceedings.**

Without this evidence—which came in only through Davis's testimony—the jury would have been left with the weak, circumstantial

54

evidence of Nero's text messages with Brown and Brown being found with four kilos of drugs hidden in a rental van with Nero's name on it. The jury was left to convict on an improper basis, which affected Nero's substantial rights and seriously affected the fairness, integrity, and public reputation of the judicial proceeding. *See United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005). As a result, this Court should vacate the Judgments of conviction and order a new trial on both counts.

## X.    CONCLUSION

Upon appellate review, Nero asks this Court to set aside his Judgment of conviction on both counts and issue a Judgment of acquittal. Alternatively, Nero asks the Court set aside the Judgment on both counts and remand the case for a new trial on the merits.

Respectfully submitted,

The Law Office of Kristin R. Brown, PLLC
17304 Preston Road, Suite 1250
Dallas, Texas 75252
Phone: 214-446-3909

_____
by Kristin R. Brown

55

Attorney for Clarence Nero
SBN: 24081458
Email: kbrown@IdefendDFW.com

## XI.    CERTIFICATE OF SERVICE

This is to certify that, on the same date as the filing of this request, a true and correct copy of the foregoing request was served upon the attorney for the government via the e-serve function of the ECF system.

_____
Kristin R. Brown

## XII.    CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed Rule App. Proc. 32(a)(7)(B) because, even including the parts of the document exempted by Fed Rule App. Proc. 32(f) and 5th CIR. R. 32.1: this document contains 12,410 words, which is less than the 13,000 words permitted.

2. This document complies with the typeface requirements of Fed Rule App. Proc. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of Fed Rule App. Proc. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in font size 14 of the Charter font.

_____
Kristin R. Brown